**KAMAL THOMAS, Appellant/Defendant**

**v.**

**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff**

**ANSELMO BOSTON, Appellant/Defendant**

**v.**

**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff**

S. Ct. Criminal Nos. 2012-0140, 2012-0145

Supreme Court of the Virgin Islands

March 10, 2014

CARL A. BECKSTEDT III, ESQ., Beckstedt & Associates, St. Croix, USVI, *Attorney for Appellant Kamal Thomas*.

BENJAMIN A. CURRENCE, ESQ., Law Offices of Benjamin A. Currence, St. Thomas, USVI, *Attorney for Appellant Anselmo Boston*.

689

TIFFANY V. MONROSE, ESQ., Assistant Attorney General, St. Thomas, USVI, *Attorney for Appellee.*

HODGE, Chief Justice; CABRET, Associate Justice; and SWAN, Associate Justice.

## OPINION OF THE COURT

### (March 10, 2014)

HODGE, *Chief Justice.* Kamal Thomas and Anselmo Boston appeal from Findings of Facts and Conclusions of Law and an accompanying Order issued by the Superior Court of the Virgin Islands on November 29, 2012.[1] Following a remand from this Court, the Superior Court held a hearing to determine whether the jury that convicted Thomas and Boston considered extraneous or extrinsic information and, if so, whether this misconduct was prejudicial. Because we defer to the trial court's factual finding that no such misconduct occurred prior to deliberations, and further conclude that the Superior Court's error in restricting the scope of the hearing was harmless, we affirm.

## I. STATEMENT OF RELEVANT FACTS AND PROCEDURAL POSTURE

This appeal represents the second attempt by Thomas and Boston to challenge the jury verdict in their second criminal trial. In their first trial, Thomas and Boston were charged with first-degree murder, second-degree murder, two counts of third-degree assault, and two counts of

---

[1] Thomas and Boston filed a joint Notice of Appeal in the Superior Court on December 12, 2012. Although the Notice of Appeal carries a Superior Court date stamp, it was not entered on the Superior Court docket sheet. (J.A. 37-38.) On this same day, Thomas filed a Notice of Appeal in this Court that included his name only and which did not reference Boston. However, he included as an exhibit to the Supreme Court Notice of Appeal a copy of the Notice of Appeal filed in the Superior Court.

Despite apparently evidencing an interest in appealing the court's orders, Boston's attorney did not take any further action on the case, and did not request a docketing letter or a briefing schedule. After the matter was scheduled for oral argument and consideration, this Court ordered Boston to inform the Court whether he wished to appeal and, if so, whether he would request leave to file briefs or, instead, join the arguments already presented by Thomas. On August 7, 2013, Boston informed the Court that he did indeed wish to appeal and he joined in Thomas's arguments. The references herein to the Joint Appendix or to the briefs relate to the Joint Appendix and briefs Thomas filed in S. Ct. Crim. No. 2012-0140.

using a dangerous weapon during the commission of a crime of violence, and simple assault, for allegedly assaulting and killing James Cockayne in St. John on June 19, 2007. Following that first trial, the jury found Thomas and Boston guilty of third-degree assault, using a dangerous weapon, and simple assault. However, the jury acquitted them of first-degree murder and second-degree murder. Subsequently, the Superior Court granted the defendants a re-trial on the basis of newly discovered evidence.

During their second trial, Thomas and Boston each faced charges of third-degree assault, using a dangerous weapon, and simple assault. Thomas was also charged with two counts of threatening a witness, which arose from Thomas's alleged attempts to intimidate witnesses who were to appear at the second trial.[2] Thomas and Boston were convicted of all charges.

Following the second trial, Thomas filed a Motion for a New Trial in the Superior Court on March 26, 2010. He supplemented that Motion on June 23, 2010. In the supplement, he alleged that prejudicial juror misconduct had occurred, depriving him of his constitutional right to a fair and impartial jury. Specifically, he alleged that after the conclusion of the evidence but before deliberations began, one of the alternate jurors — who, it was later disclosed, was A.H.[3] — entered the jury deliberation room to obtain her personal items before she was sent home. At that time, she heard one or more of the jurors discussing their belief that Thomas and Boston had killed the "white boy" in St. John and had gotten away with it, and needed to be taught a lesson. Thomas requested a hearing on the matter. The Superior Court denied the motion and, on November 23, 2010, entered a Judgment and Commitment.

Thomas and Boston both separately appealed that Judgment and Commitment to this Court. In a decision issued on May 2, 2012, we reversed Thomas's Judgment and Commitment and remanded the case, holding that the trial court had abused its discretion when it denied Thomas's request for an evidentiary hearing. *Thomas v. People* (*Thomas I*),

---

[2] These charges were brought pursuant to the following respective provisions of the Virgin Islands Code: 14 V.I.C. § 297(2), 14 V.I.C. § 2251(a)(2)(B), 14 V.I.C. § 299(2), and 14 V.I.C. §§ 1510(a)(1), (2).

[3] This Court's preference is to avoid using the names of jurors wherever possible. That convention is followed here and the jurors are referred to by their initials only.

56 V.I. 647, 649-51 (V.I. 2012). Although Boston did not raise the issue of jury misconduct on appeal, we reversed his conviction in the interests of justice, and remanded the case. *Boston v. People*, 56 V.I. 634, 636 & n.7, 646 (V.I. 2012). We directed the Superior Court to " 'ascertain whether the misconduct actually occurred; if it did, determine whether it was prejudicial; and if there are no grounds for a new trial, specify the reasons that misconduct did not occur, or occurred but was non-prejudicial.' " *Thomas I*, 56 V.I. at 658 (quoting *United States v. Resko*, 3 F.3d 684, 691 (3d Cir. 1993)).

Following the remand, the Superior Court held evidentiary hearings on October 9 and November 13, 2012. All of the jurors that had participated in the second trial testified, although two appeared by telephone. Michael Joseph — Thomas's counsel at the time of the second trial — also testified. Attorney Joseph noted that the jury had issued its verdict in the case on March 24, 2010. The next day, he received a voicemail message from A.H. on his personal cell phone,[4] although he did not listen to the message until March 26, 2010. (J.A. 127.) He returned the call after hearing the message and spoke to her. (J.A. 131.) A.H. told Attorney Joseph that "she could not sleep the night she learned the jury had convicted Mr. Thomas because she felt she should have told [the court] that . . . at least two [jurors] had already determined that [Thomas] would be convicted because he had killed . . . 'the white boy from St. John.' " (J.A. 128.) A.H. told Attorney Joseph that one of the jurors making these comments was the foreperson, who was female, and Attorney Joseph concluded that she meant juror K.S. (J.A. 129.) A.H. indicated that the other juror who had made comments was a man of light complexion who was "more bald than hairy," whom the parties concluded was V.J. (J.A. 46, 129-30.) A.H. characterized those two jurors as "ring leaders" who were "attempting to recruit other jurors" to their perspective before deliberations. (J.A. 131-32.) Attorney Joseph told the court that although he had asked A.H. at the time of the disclosure to sign an affidavit stating what she had observed, A.H. was reluctant to put anything in writing, particularly after speaking to Stylish Willis, Esq., an attorney that her

---

[4] A.H. and Joseph both testified that she had his personal phone number on file because, as a secretary in the law office of Attorney Leonard Francis, she sometimes placed calls to Joseph on Attorney Francis's behalf. (J.A. 49-50, 127-28.)

employer — Leonard Francis Jr., Esq. — had recommended she consult. (J.A. 49, 51, 132-33.)

Although all of the jurors, including the alternate jurors, provided testimony during the hearing, only A.H. recalled any commentary about the defendants' role in James Cockayne's death.

Following the hearing, the court issued Findings of Fact and Conclusions of Law, finding that "no juror corroborated" the accusations of misconduct, and consequently finding that "no juror misconduct occurred," and further concluding that, "there is no proof that any of the alleged statements or references were extraneous or extrinsically improperly brought to the jury's attention or from any outside influence." (J.A. 55-56.)

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

"The Supreme Court [has] jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." V.I. CODE ANN. tit. 4, § 32(a). Because the Superior Court's November 29, 2012 Findings of Fact, Conclusions of Law, and Order denying Thomas's Motion for a New Trial constitute final orders, and Boston has expressed his "desire[ ] to also appeal the Superior Court['s] decision" and "wishes to fully join in all of the arguments made by . . . Thomas," this Court has jurisdiction over these appeals. *See, e.g., Francis v. People*, 56 V.I. 370, 379 (V.I. 2012).

We review the Superior Court's factual findings for clear error and exercise plenary review over the Superior Court's application of the law to those facts. *St. Thomas-St. John Bd. of Elections v. Daniel*, 49 V.I. 322, 329 (V.I. 2007); *see also People v. John*, 52 V.I. 247, 255 (V.I. 2009) (quoting *United States v. Shields*, 458 F.3d 269, 276 (3d Cir. 2006)), *aff'd*, 654 F.3d 412, 55 V.I. 1324 (3d Cir. 2011). A trial court may grant a defendant a new trial if required in the interest of justice. SUPER. CT. R. 135. "The standard of review on a motion for a new trial is abuse of discretion unless the court's denial of the motion is based on application of a legal precept, in which case our review is plenary." *Phillips v. People*, 51 V.I. 258, 280 (V.I. 2009) (internal quotation marks and citations omitted). Likewise, the Court reviews the trial court's investigation into any extraneous information, and its finding regarding the effect of any

such information on the verdict, for abuse of discretion. *United States v. Lloyd*, 269 F.3d 228, 237 (3d Cir. 2001).

## B. The Hearing Did Not Establish Appellants' Entitlement to a New Trial

■ Thomas and Boston argue that the evidence presented at the *Remmer* hearing[5] established his entitlement to a new trial, citing their right to an impartial jury under the Sixth Amendment to the Constitution. U.S. CONST. amend. VI;[6] *see Parker v. Gladden*, 385 U.S. 363, 364, 87 S. Ct. 468, 17 L. Ed. 2d 420 (1966) (noting that evidence against a defendant that comes from someone other than a witness, and is considered by the jury, may violate a "defendant's right of confrontation, of cross-examination, and of counsel," and, therefore, his right to a fair trial); *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998) (noting that the bias or prejudice of a single juror violates a defendant's right to an impartial jury); *see also In re Michael*, 326 U.S. 224, 228, 66 S. Ct. 78, 90 L. Ed. 30 (1945) ("[I]t is difficult to conceive of a more effective obstruction to the judicial process than a juror who has prejudged the case.").

The trial court rejected Thomas's assertion of misconduct, apparently disbelieving the statements that A.H. made to Attorney Joseph and the testimony she provided in the hearing. The court did not specifically or clearly rule that A.H. was not credible, but it found that,

> 115. Having heard all witness testimony rendered in the *Remmer* Hearings, this Court notes that no juror corroborated any of the allegations made by [A.H.] during her testimony rendered on October 9, 2012, or as stated in the Affidavit filed by Counsel for Defendant Thomas.

---

[5] *See Remmer v. United States*, 347 U.S. 227, 229, 74 S. Ct. 450, 98 L. Ed. 654 (1953) (stating that a court — when presented with evidence of jury tampering or misconduct — should hold a hearing to determine whether the misconduct occurred and, if so, whether it was prejudicial to the defendant).

[6] The Sixth Amendment applies to the Virgin Islands through its express incorporation by the Revised Organic Act, the Territory's constitution. 48 U.S.C. § 1561 (stating that the "first to ninth amendments inclusive" are "extended to the Virgin Islands . . . and shall have the same force and effect there as in the United States or in any State of the United States"). The complete Revised Organic Act of 1954 is found at 48 U.S.C. §§ 1541-1645 (2006), reprinted in V.I. CODE ANN., Historical Documents, Organic Acts, and U.S. Constitution at 73-177 (1995 & Supp. 2013) (preceding V.I. CODE ANN. tit. 1).

116. Therefore, this Court finds that no juror misconduct occurred in the second trial of the above-captioned matters as alleged by [A.H.].

(J.A. 55.)

█ As this excerpt makes clear, the trial court found that no juror misconduct had occurred during the trial. We noted above — and it bears repeating — that a determination whether juror misconduct has occurred is a factual determination reviewed only for abuse of discretion. *Lloyd*, 269 F.3d at 237. Consequently, the Court reverses such a factual finding only if it was clearly erroneous. *St. Thomas-St. John Bd. of Elections*, 49 V.I. at 329; *Commonwealth v. McCowen*, 458 Mass. 461, 939 N.E.2d 735, 763 (2010) (applying this standard to issues of juror misconduct). This standard is applied because the trial court has a "unique perspective at the scene" and so "is in a far superior position than [the appellate court] to appropriately consider allegations of juror misconduct." *United States v. Boone*, 458 F.3d 321, 329 (3d Cir. 2006); *see also United States v. Cox*, 324 F.3d 77, 87 (2d Cir. 2003) (stating the trial court "is best situated to evaluate jurors' credibility") (citing *United States v. Panebianco*, 543 F.2d 447, 457 (2d Cir. 1976)).

The Superior Court appeared to question A.H.'s credibility for several reasons, noting facts that apparently undermined the court's estimation of A.H.'s truthfulness — although, as noted above, the court never explicitly concluded that A.H. was lying. The court found that A.H. indicated on her juror questionnaire that she was "single," but also answered a question regarding her "spouse's occupation," as "Deputy Marshal," even though she is not married. (J.A. 49.) Furthermore, A.H. denied on the questionnaire that she had ever worked in a private law office, and described her occupation only as "secretary," even though she was a "Legal Secretary" at a law office. (*Id.*) The Superior Court also found it sufficiently relevant to recount that A.H. worked for Attorney Francis, and that Attorney Francis served as the Vice Chairman of the Territorial Public Defender Board at the same time that Attorney Joseph served on the Board. (*Id.*) The court further noted that A.H. was aware that Attorney Francis and Attorney Joseph served on the Board together, "and held frequent communications." (*Id.*)

The Superior Court also appeared to discount Attorney Joseph's testimony. It noted that the attorneys had "common ties" to and "frequent connections" with each other, but that Attorney Joseph denied during his

695

hearing testimony that he had ever conversed with A.H. or knew how she had his personal cell phone number.[7] (J.A. 50.) The Superior Court appeared to believe this statement was impeached by A.H., who said that she and Attorney Joseph were related by an uncle's marriage and that she regularly made contact with him using his personal cell phone number on behalf of her employer. (*Id.*) Furthermore, the Superior Court underlined the fact that A.H. refused to produce a sworn affidavit, apparently on the advice of counsel. (J.A. 51.)

The Superior Court also questioned the means by which the allegation of misconduct was brought to its attention. It noted that while A.H. testified she was unaware of the jury's verdict until March 25, 2010 — the day after the verdict — this testimony "is at odds with Attorney Joseph's testimony," since Attorney Joseph said he received a voicemail message from A.H. on March 25, 2010, in which A.H. stated that she had learned about the verdict, then was unable to sleep at night, and then the day after that, she called Attorney Joseph. (J.A. 51.)

Finally, the Superior Court emphasized that none of the other jurors corroborated A.H.'s allegations. V.J. — the juror who A.H. alleged had made the statement — "vehemently denied these accusations," according to the court. (J.A. 51.) All of the other jurors indicated that no one discussed Thomas's guilt or innocence before deliberations. Each juror also either did not recall if anyone made a statement similar to the one V.J. is alleged to have made, or they denied that anyone made such a statement.[8] (J.A. 54-55.)

■ Given the testimony at the *Remmer* hearing, another judge — indeed, this Court — might have ruled differently as to A.H.'s credibility and might not have concluded that there were sufficient inconsistencies regarding her questionnaire and other testimony to distrust her testimony

---

[7] Attorney Joseph actually testified that he had not had a conversation with A.H. prior to her disclosure about the alleged juror misconduct, and that he did not know how she got his personal cell number, but surmised that she got it from Attorney Francis or from Attorney Joseph's investigator. (J.A. 125-27.)

[8] When asked whether she recalled anyone making the statement that "the defendants had killed the white boy and got away with it and we have to teach them a lesson," the foreperson, K.S., stated, "I don't recall before deliberations." (J.A. 305.) Then, when asked whether any particular juror had said that "those are the guys that killed the white boy and got away with it . . . . we have to teach them a lesson," the foreperson responded, "Oh no. . . . No, I have not heard anything like that." (J.A. 330-31.)

regarding the alleged misconduct.[9] However, our task is not to decide whether we would have made the same decision as the trial court, but rather it is limited only to a determination of whether there was an abuse of discretion. An abuse of discretion occurs when the trial court makes a decision that "rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Petrus v. Queen Charlotte Hotel Corp.*, 56 V.I. 548, 554 (V.I. 2012) (internal quotation marks and citations omitted).

Here, the trial court made a factual finding — that no misconduct occurred prior to deliberations — and so we would only reverse if this finding is clearly erroneous. The trial court made a credibility determination, weighing the testimony of A.H. against the testimony of other jurors. "In assessing these circumstances on appeal, we are mindful that a 'trial court's findings on issues of juror credibility and honesty are determinations peculiarly within trial judge's province and are accorded great deference.'" *Vergile v. People*, 54 V.I. 455, 461 (V.I. 2010) (quoting *Amirault v. Fair*, 968 F.2d 1404, 1405 (1st Cir. 1992) (additional internal quotation marks and citation omitted)); *see also Skilling v. United States*, 561 U.S. 358, 130 S.Ct. 2896, 2923, 177 L. Ed. 2d 619 (2010) (noting that when evaluating a trial court's determination regarding a juror's alleged bias, the "deference due" to the trial court "is at its pinnacle"). This is because the trial court "possesses a superior capacity to observe the demeanor of . . . jurors and to assess their credibility." *United States v.*

---

[9] We recognize that this is a close case. There are any number of possible explanations for the inconsistencies on which the trial court so heavily relied. A.H. may have thought of her partner as her "spouse," and may have — in the interest of full disclosure — indicated that he was a Marshal to be sure that the attorneys had complete information, even though she was never formally married. Furthermore, the difference between a "secretary" and "legal secretary," may not be considered that significant. She may have misremembered the date on which she heard the verdict, or the "sleepless night" might have been the night following hearing the juror's comments rather than the night after hearing of the verdict. Finally, as to the intimation that somehow Attorney Francis and Attorney Joseph may have been communicating together about this case, or that A.H. was lying to curry favor with one of them, or lying at the direction of Attorney Francis, there is insufficient support in the record to draw such conclusions. Indeed, in *Thomas I*, this Court highlighted this judge's prior failure "to explain why these inconsistencies would make [A.H.'s] statement completely unreliable." 56 V.I. at 657 n.18. However, now that a hearing has been held, the trial court has had the opportunity to consider A.H.'s demeanor, her explanations for her inconsistencies and, perhaps more importantly, the demeanor of those other jurors who denied the allegations. As emphasized above, we defer to such credibility determinations.

*Mitchell*, 690 F.3d 137, 142, 57 V.I. 856 (3d Cir. 2012). Considering the entire record, we cannot say that, in deciding whether to believe A.H. or to believe the other jurors, all of whom uniformly denied A.H.'s allegations, the trial court clearly erred when it concluded that no misconduct had occurred. *See United States v. Bertoli*, 40 F.3d 1384, 1395 (3d Cir. 1994) ("[W]e cannot say that the trial court's decision to believe [one juror over another] was clearly erroneous. The trial court had to believe one of the two jurors."); *Barboni v. Tuomi*, 210 Cal. App. 4th 340, 148 Cal. Rptr. 3d 581, 591 (2012) (stating that where a "case comes down to a battle of declarations," the appellate court would defer to the trial court's determination that no misconduct had occurred); *State· v. Covington*, 343 S.C. 157, 539 S.E.2d 67 (Ct. App. 2000) ("Given the conflicting evidence [regarding whether juror misconduct had occurred], we defer to the sound judgment of the trial judge in resolving a disputed factual issue and, therefore, find no abuse of discretion on his part."). Consequently, we do not find that the trial court abused its discretion when it found that no misconduct occurred.

## C. Scope of the Hearing

Thomas and Boston also argue that the trial court impermissibly restricted the scope of the *Remmer* hearing by declining to permit the parties to ask questions of the witnesses regarding whether any misconduct occurred after deliberations began, apparently believing that such an inquiry is prohibited by Federal Rule of Evidence 606(b).

■ The Superior Court did err in its legal reasoning. As this Court noted in the *Thomas I* decision, although Rule 606(b) of the Federal Rules of Evidence generally prohibits inquiries into statements made or incidents that occur during deliberations, there are three important exceptions. We specifically noted that a court may inquire "into extraneous information or outside influences brought to bear upon jurors." *Thomas I*, 56 V.I. at 654. We further stated that the juror's "alleged statement that Thomas and Boston had gotten away with killing Cockayne would thus constitute extraneous information — a matter considered by the jury but not admitted into evidence." *Id.* at 656. Despite the language of *Thomas I* and the plain meaning of Rule 606(b), the Superior Court appeared to assume that an intra-jury statement by definition could not be extraneous, within the meaning of Rule 606(b). (J.A. 275-83.)

■ Although the trial court's reasoning was erroneous, Thomas and Boston have nevertheless not met their burden of demonstrating that any misconduct occurred during deliberations. *See Smith v. Phillips*, 455 U.S. 209, 215, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982) ("This Court has long held that the remedy for allegations of juror partiality is a hearing in which the *defendant has the opportunity to prove* actual bias.") (emphasis added). The only evidence in the entire record that remotely supports the potential for juror misconduct was M.M.'s testimony that "we did not know a hundred percent who actually killed the victim and no one discussed that until deliberations." (J.A. 332.) But even if we were to infer, from this statement, that the jurors deliberated the question of how Cockayne died or who killed him, it does not constitute juror misconduct that requires a new trial as a remedy.

As we noted in *Thomas I*, although "[t]he People did not present any evidence directly implicating Thomas [and Boston] in Cockayne's death," 56 V.I. at 651 n.6, the jurors were presented with evidence that Cockayne was murdered on the same night of the assault. (Trial Tr. Mar. 23, 2010, 75-76) (defense witness G.B. stating that "[Cockayne] had been murdered" the night of the assault).[10] Moreover, Delbert Phipps, a police corporal, testified that he had "traveled to St. John . . . to investigate *the homicide* of Mr. James Cockayne," and that he encountered Thomas and Boston during the course of his investigation. (Trial Tr. Mar. 22, 2010, 171-72) (emphasis added). Additionally, the testimony of Dr. Francisco Landron, a forensic pathologist and medical examiner, necessarily suggested that Cockayne died the evening of the assault and that Dr. Landron examined his body post-mortem. (Trial Tr. Mar. 23, 2010, 25.)[11] Neither Thomas nor Boston objected to any aspect of the above testimony. In other words, the jurors did not find out that Cockayne had been murdered by reading the newspaper or from some other external source, but through evidence introduced, without objection, at trial. Yet, despite hearing testimony that Cockayne was killed the very same night

---

[10] Although not included in the Joint Appendix, the full trial transcript was filed with this Court as part of Boston's earlier appeal to this Court, docketed as S. Ct. Crim. No. 2010-0086.

[11] Counsel for Thomas, in questioning Dr. Landron, further made clear that Cockayne died the evening of the assault: "Doctor, isn't it also true that you can't say to a medical certainty within, other than at the estimated time of the passing of James Cockayne, at what point of the night either those contusions were inflicted." (Trial Tr. Mar. 23, 2010, 31).

that Thomas and Boston had allegedly assaulted him and that the police discovered Thomas and Boston through a homicide investigation into Cockayne's death, the jurors were provided with absolutely no explanation as to who may have caused Cockayne's death.

■ Simply put, the jurors could not have engaged in misconduct simply by discussing, during deliberations, evidence that was properly introduced at trial. To the extent those deliberations may have transformed into discussion as to who may have killed Cockayne, such discussion is natural in a case where the defendants are charged with third-degree assault yet evidence is introduced that the victim died shortly after the alleged assault occurred. Notably, Thomas and Boston are directly responsible for this state of affairs, in that they (1) failed to challenge — either at trial or as part of their prior appeals to this Court — the admission of testimony stating that Cockayne was murdered the night of the assault; and (2) after that testimony was admitted as substantive evidence, did not move the trial judge to cure any prejudice by permitting them to introduce evidence that another individual had already been convicted of killing Cockayne. In other words, having elected to stay silent while multiple witnesses testified that Cockayne had been killed the very same night and that the death was investigated as a homicide, and then having further decided to make no attempt to explain the situation to the jury, Thomas and Boston cannot obtain the windfall of a new trial by simply pointing to evidence, without more, that the jurors may have discussed, during deliberations, who killed Cockayne. *Cf. Fontaine v. People*, 56 V.I. 571, 583-84 (V.I. 2012) (declining to review sufficiency argument when defendant takes opposite position on appeal from that taken at trial). Accordingly, the Superior Court's error in restricting the scope of the hearing is harmless, since any discussion of who killed Cockayne that may have occurred during deliberations would not constitute juror misconduct.

### III. CONCLUSION

Although this is a close case, we defer to the trial court's credibility determinations and we conclude that the trial court's finding that no misconduct occurred prior to deliberations was not clearly erroneous. As to the challenge by Thomas and Boston to the scope of the *Remmer* hearing, we conclude that, while the trial court misunderstood this Court's mandate and its power under the Federal Rules of Evidence, any such

error was harmless because the jurors were aware, through evidence introduced at trial and not objected to by Thomas or Boston, that Cockayne had died and that his death had been investigated as a homicide. Therefore, we affirm.