**CECIL FRANCIS, Appellant/Defendant**

**v.**

**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff**

S. Ct. Criminal No. 2015-0002

Supreme Court of the Virgin Islands

October 23, 2015

725

726

727

728

DAVID J. CATTIE, ESQ., Ogletree Deakins Nash Smoak & Stewart, LLC, St. Thomas, USVI, *Attorney for Appellant.*

PAMELA R. TEPPER, ESQ., Assistant Attorney General, St. Thomas, USVI, *Attorney for Appellee.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice.*

## OPINION OF THE COURT

(October 23, 2015)

HODGE, *Chief Justice.* Cecil Francis appeals his conviction in the Superior Court on two counts of aggravated rape in the second degree, one count of unlawful sexual contact in the first degree, and one count of vagrancy. For the reasons that follow, we affirm Francis's convictions for aggravated rape in the second degree and unlawful sexual contact in the first degree, but reverse his vagrancy conviction.

## I. STATEMENT OF RELEVANT FACTS AND PROCEDURAL POSTURE

On May 6, 2013, Francis was arrested and ultimately charged with four counts of aggravated rape in the second degree, two counts of unlawful sexual contact in the first degree, two counts of unlawful sexual contact in the second degree, one count of vagrancy, and one count of obscene and indecent conduct. Each of these counts was in relation to conduct Francis allegedly engaged in with his nephew, J.T., who was an unmarried minor at the time of the charged incidents.

During a bench trial, which began on July 29, 2014, J.T's father testified that he was at his home on May 4, 2013, when he witnessed his brother-in-law, Francis, with one arm around J.T's neck and one arm around his waist. After Francis left the house, J.T.'s father discussed the incident with his son, and then called his wife and the police. When the police arrived at the house, they took statements from both J.T. and his father. J.T. told the officers that Francis had touched him inappropriately, and that "he was rubbing against me with his hands, with his body, [and h]e pushed his hand inside of my drawers," (J.A. 41-42), but he denied that Francis had ever touched him inappropriately before that day. The next day, May 5, 2013, J.T. went to the police station and told the police officers the "whole story," (J.A. 52), explaining that on multiple occasions Francis had forced him to perform oral sex, that Francis had inserted a finger into his anus, and that he had taken pictures of Francis's genitals.

Specifically, J.T. testified at trial that his first inappropriate contact with Francis occurred on July 26, 2012, near the bus stop by the hospital in Estate Thomas, where J.T. photographed Francis, taking a "whole body picture, but his penis was out." (J.A. 46.) A couple weeks later, on August 10, 2012, J.T. had helped his mother check-in at the airport for her flight off island, when he received a phone call from Francis, who invited him over to his house. Francis and an unidentified female picked J.T. up from the airport, but while en route to Francis's house, the female's car malfunctioned and J.T. and Francis were forced to walk the rest of the way. Upon arriving at the house, Francis undressed and told J.T. "to suck his genitals." (J.A. 33.) J.T. complied. Francis then took off J.T.'s pants and they both went and bathed together. J.T. testified that after bathing, Francis: "told me to rub his back. And he told me to suck his penis, too. After that he ejaculated in my face and he told me to swallow his ejaculation. After that I washed my face, put on my clothes and left the house. I walk down the hill. I told him I didn't had no money; he gave me two or three dollars. I went to the mall." (J.A. 34.) J.T. also stated that at one point during that encounter Francis put his finger in J.T.'s anus.

The next incident occurred on March 9, 2013. J.T. testified that Francis was at his house for a plate of food, and that afterwards they drove into town together. Francis took J.T. to what used to be his grandmother's house; once there, Francis had J.T. perform oral sex on him and Francis also put his finger in J.T.'s anus. J.T. also took more photos, this time capturing only Francis's penis. J.T. testified that he later left the house and walked to Kmart, where his mother worked. Finally, J.T. testified to an incident that occurred in his house, sometime between March 9, 2013, and May 3, 2013 — the day J.T's father called the police — where Francis "pulled my drawers down. He beat his genitals on me and he ejaculated." (J.A. 40.)

Francis testified in his own defense. He repeatedly testified that he did not commit any of the acts of which he was accused. Francis testified that J.T. "never took no pictures of me. [J.T.] never been no place naked with me. [J.T.] never take no pictures of me." (J.A. 232.) Francis explained that the naked photos of him were taken by a girlfriend, and he surmised that J.T. must have somehow seen them on his phone and got a copy of them. He also explained that the reason he left the house on May 4, 2013, was not because J.T.'s father caught him touching J.T., but

because J.T's father "is a drunkard" and "always in jail for being drunk and disorderly." (J.A. 239.)

The Superior Court found Francis guilty of four counts of aggravated rape in the second degree, one count of unlawful sexual contact in the first degree, and vagrancy. The court found that Francis was not guilty of unlawful sexual contact in the first degree because there was no "evidence in this record that force or coercion was used to accomplish the sexual contact." (J.A. 310.) The Superior Court also held that there was insufficient evidence establishing that J.T. was over 13 but under 16 years of age on March 9, 2013, and thus, found Francis not guilty of two counts of unlawful sexual contact in the second degree. Finally, the Superior Court dismissed one count of obscene and indecent conduct because there was no evidence that J.T. was offended when Francis exposed his penis to him.

Francis appeared before the Superior Court on November 24, 2014, for sentencing. At the hearing, the Superior Court denied Francis's motions for a new trial and to arrest judgment but granted Francis's motion for judgment of acquittal on two counts of aggravated rape in the second degree because the People failed to prove an aggravating factor based on age. The Superior .Court then sentenced Francis to 30 years of incarceration for the first count of aggravated rape in the second degree and stayed imposition of a second 30-year sentence on the second count of aggravated rape in the second degree in accordance with 14 V.I.C. § 104. The Superior Court sentenced Francis to five years of incarceration with respect to the single count of unlawful sexual contact in the first degree, to run consecutive to the sentence imposed for the first count of aggravated rape in the second degree. Finally, the Superior Court sentenced Francis to 90 days of incarceration for his vagrancy conviction, to run concurrent with the other counts. The Superior Court's decision was memorialized in a December 8, 2014 judgment and commitment. Francis timely filed a notice of appeal on January 6, 2015.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

This Court has appellate jurisdiction over "all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." V.I. CODE ANN. tit. 4, § 32(a). Because the

Superior Court's December 8, 2014 judgment and commitment constitutes a final judgment, this Court possesses jurisdiction over Francis's appeal. *Codrington v. People*, 57 V.I. 176, 183 (V.I. 2012); *Williams v. People*, 55 V.I. 721, 727 (V.I. 2011).

This Court engages in a *de novo* review when the sufficiency of the evidence is challenged. *Percival v. People*, 62 V.I. 477, 484 (V.I. 2015). "An appellant who challenges the sufficiency of the evidence bears a 'very heavy burden,' " *Charles v. People*, 60 V.I. 823, 831 (V.I. 2014) (quoting *Latalladi v. People*, 51 V.I. 137, 145 (V.I. 2009)), as the evidence is viewed "in the light most favorable to the government." *Gilbert v. People*, 52 V.I. 350, 354 (V.I. 2009) (citing *Latalladi*, 51 V.I. at 145); *Cascen v. People*, 60 V.I. 392, 401 (V.I. 2014). When reviewing a denial of a motion for a new trial, this Court "will not interfere with the Superior Court's ruling absent an abuse of discretion." *Percival*, 62 V.I. at 490; *Joseph v. People*, 60 V.I. 338, 345 (V.I. 2013). Where the denial of a motion for a new trial is based on an application of a legal precept, our review is plenary. *Thomas v. People*, 60 V.I. 688, 693 (V.I. 2014); *Phillips v. People*, 51 V.I. 258, 280 (V.I. 2009). And finally, we engage in plenary review of "all constitutional questions of law." *Carty v. People*, 56 V.I. 345, 354 (V.I. 2012).

## B. Sufficiency of the Evidence

■ Francis challenges the sufficiency of evidence presented by the People as to all four of his convictions. When reviewing the evidence for sufficiency, this Court must look to see whether the People proved beyond a reasonable doubt each element of every crime charged. *Percival*, 62 V.I. at 484 (citing *Webster v. People*, 60 V.I. 666, 678-79 (V.I. 2014)).

### 1. *Aggravated rape in the second degree*

■ Francis was convicted of two counts of aggravated rape in the second degree. To be found guilty of aggravated rape in the second degree, the People were required to prove that Francis "perpetrat[ed] an act of sexual intercourse or sodomy with a person who is under eighteen years but thirteen years or older and not the perpetrator's spouse, or by force, intimidation, or [his] position of authority over the victim is used

to accomplish the sexual act." 14 V.I.C. § 1700a(a).[1] We have previously held that the People must prove that either force, intimidation, or abuse of a position of authority was used to accomplish the sexual act in order to sustain a conviction for aggravated rape in the second degree as to a 17-year-old victim. *Gilbert*, 52 V.I. at 361. But we have thus far not determined whether force, intimidation, or abuse of a position of authority must be proven when the victim is 16 years old or younger. In *Charles*, "it [wa]s clear that Charles's position of authority over X.P. [as her stepfather] was used to accomplish the rape," and thus it was not necessary to determine whether age alone is ever sufficient to act as the aggravating factor for rape in the second degree. 60 V.I. at 832 n.4.[2] Unlike the factual context in *Charles*, it is not clear in this case that Francis — J.T.'s uncle with whom J.T. appeared to have only infrequent contact — utilized his "position of authority" over J.T. to accomplish his sexual assaults. In fact, there is no evidence in the record that Francis used his relationship as J.T's uncle to force J.T. to do anything. Nor is there any evidence that Francis used force or intimidation to accomplish the sexual acts. Thus, we must now determine whether the age of the minor victim alone is sufficient to sustain a conviction of aggravated rape in the second degree.

The Child Protection Act of 2002, Act No. 6497 (V.I. Reg. Sess. 2002), included provisions that "raise[d] penalties for sexual acts — consensual or otherwise — between adult perpetrators and children under sixteen years of age by imposing mandatory minimum sentences." *Gilbert*, 52 V.I. at 358 (citations omitted). In *Gilbert*, we recognized that

---

[1] Sections 1700(a) and 1708 were revised on October 15, 2013, removing the requirement that the victim not be the perpetrator's spouse. Act No. 7517, § 1(a); *Rawlins v. People*, 61 V.I. 593, 603 n.5 (V.I. 2014). In this case, since the alleged incidents occurred prior to the Legislature's revision of these sections, we address the elements of the crime in effect at the time of Francis's conduct. *Id.*

[2] In discussing section 1700a(a) in *Charles*, we mischaracterized our earlier holding in *Gilbert* as leaving open the question of whether "the People·were required to prove that the sexual act was committed through the use of force, intimidation, or the perpetrator's position of authority when the victim is between the ages of thirteen and *eighteen*." 60 V.I. at 832 n.4 (emphasis added). But as our discussion here makes clear, *Gilbert* held that the People *are* required to prove the use of force, intimidation, or abuse of a position of authority to sustain a conviction under section 1700a(a) against a victim seventeen or older, expressly leaving unresolved only the issue of whether this element is required for victims between the ages of thirteen and *sixteen* — not eighteen as stated in *Charles*. *Gilbert*, 52 V.I. at 361.

734

the Child Protection Act of 2002 was modeled after statutes enacted in Maryland and Washington, where "the age of the victim is one of several potentially aggravating factors." *Id.* at 359 (citations omitted). But in *Gilbert*, we held that proof of force, intimidation, or use of a position of authority was a necessary element under section 1700a(a) as to a 17-year-old victim because to hold otherwise would "lead to absurd consequences the Legislature could not have intended." *Id.* at 359.

> Notably, a literal interpretation of section 1700a — which does not contain any "Age Gap" provisions — would authorize the prosecution of eighteen-year-olds who have consensual sex with seventeen-year-olds, and, at a minimum, subject those eighteen-year-olds to a mandatory ten-year prison sentence. Likewise, although the Legislature clearly intended to punish older adults who have sexual relations with children under the age of sixteen more harshly than those who have consensual sex with sixteen- and seventeen-year-olds, the People's interpretation of section 1700a would impose the same minimum punishment on both types of offenders.

*Id.* at 359-60. Unlike the circumstances reviewed in *Gilbert*, where the omission of the element of force, intimidation, or use of position of authority would render the statute absurd, were we to require proof of force, intimidation, or use of position with respect to 13-, 14-, or 15-year-old victims, it would render the statute absurd and would leave a gaping hole in the People's ability to charge adult perpetrators who engage in sexual acts with minors. Title 14, section 1702 of the Virgin Islands Code, which makes statutory rape unlawful in the Territory, applies only to victims who are 16 or 17 years old. Section 1703 of title 14 of the Virgin Islands Code applies to victims who are 13, 14, and 15 years old, but only when the perpetrator is 16 or 17. There is no other statute that criminalizes consensual sexual relations between an adult and a child between the ages of 13 and 16. It is unthinkable that the Legislature would criminalize consensual sexual relations between a 17-year-old and a 14-year-old, *see* 14 V.I.C. § 1703, but require the People to prove an extra aggravating factor — force, intimidation, or use of position — when a 25-year-old has sexual relations with a 14-year-old. Yet that untenable interpretation is what Francis is asking this Court to adopt. We cannot find logical or legal justification for that reading. Instead, we agree with the Superior Court and hold that under 14 V.I.C. § 1700a the age of the victim — when the victim is 13, 14, or 15 years old

— constitutes an aggravating factor, and to establish guilt the People need not in addition prove force, intimidation, or use of position of authority to accomplish the sexual act.

██ This interpretation fits naturally within title 14's overall sexual assault scheme. Section 1700 of title 14 governs aggravated rape in the first degree. A perpetrator who has sexual relations with a child under the age of 13 is guilty of aggravated rape in the first degree. 14 V.I.C. § 1700. A perpetrator who has sexual relations with a 13-, 14-, or 15-year-old, where the perpetrator, who not only resides in the same household as the child, but also uses "force, intimidation, or [their] position of authority over the victim to accomplish the sexual act" is likewise guilty of aggravated rape in the first degree. 14 V.I.C. § 1700. Thus, section 1700 defines a more serious crime with respect to 13-, 14-, or 15-year-old victims, when further aggravating factors are present. It also imposes a more severe penalty; aggravated rape in the first degree carries a mandatory minimum 15-year sentence while aggravated rape in the second degree carries a mandatory minimum 10-year sentence. *Compare* 14 V.I.C. § 1700 *with* 14 V.I.C. § 1700a.

██ ██ In this case, the People charged Francis with one count of aggravated rape in the second degree for the alleged acts he committed on August 10, 2012, when he "perpetrated an act of sexual intercourse or sodomy with a person not his spouse, to wit: J.T., who was under eighteen years of age but thirteen years or older; to wit: he . . . put his penis in J.T.'s mouth." (J.A. 17.) The second count of aggravated rape in the second degree charged Francis with putting "his finger into the buttocks of J.T.," also occurring on August 10, 2012. (J.A. 17.) The record supports the finding that J.T. was 15 years old on August 10, 2012. (J.A. 305-06.) Because J.T. was an unmarried 15-year-old[3] at the time of the alleged incident, which constitutes an aggravating factor, the People needed to

---

[3] On appeal, Francis makes the argument that the People did not prove that J.T. was unmarried at the time the acts were allegedly committed and only offered evidence of J.T's marital status at the time of the trial. However, "when determining the sufficiency of the evidence, we 'credit all reasonable inferences that support the verdict.' " *Castor v. People*, 57 V.I. 482, 489 (V.I. 2012) (quoting *Nanton v. People*, 52 V.I. 466, 485 n.10 (V.I. 2009)). Throughout the trial testimony, Francis was referred to as J.T.'s uncle (J.A. 44), or even as the brother of J.T.'s mother (J.A. 28, 247), but never as J.T.'s spouse. There is simply no evidence in the record that J.T. had married his uncle. On these facts "[w]e have no trouble determining that the foregoing, coupled with the fact that [J.T.] testified that [he] was not married to [Francis] at

prove only that Francis perpetrated an act of sexual intercourse or sodomy on J.T. "Sodomy" means "carnal knowledge of any person by the mouth, i.e., cunnilingus or fellatio; or by the anus; or by submission to the same; or by any insertion, however slight, of any object into a person's anus, excluding such insertion for medical treatment or examination." 14 V.I.C. § 1699. J.T. testified that on August 10, 2012, he performed fellatio on Francis, at Francis's request. (J.A. 33-34.) He also testified that while he was on the bed, Francis "took his middle or index finger and put it up [his] rear" and that he "screamed because it was painful." (J.A. 35-36.) This testimony, combined with proof of J.T.'s age, is sufficient to sustain both convictions of aggravated rape in the second degree. *See Charles*, 60 V.I. at 834 (holding "uncorroborated testimony of the victim is sufficient to sustain the convictions" (citing *Stevens v. People*, 52 V.I. 294, 308 (V.I. 2009))).

### 2. Unlawful sexual contact in the first degree

The People charged that on or about May 4, 2013, Francis "engaged in sexual contact with a person not his spouse, to wit: J.T., when force or coercion was used to accomplish the sexual contact in that he put his hand into J.T's brief without J.T.'s consent and touched J.T.'s buttocks, in violation of 14 V.I.C. § 1708(1)." (J.A. 18.) "Under section 1708(1), one may be convicted of unlawful sexual contact if one engages in sexual contact with a person who is not the perpetrator's spouse when force or coercion is used to accomplish the sexual contact." *Gilbert*, 52 V.I. at 362.

■■ The Legislature defined "sexual contact" as "any touching of another person with the genitals or any touching of the genitals, anus, groin, inner thighs, buttocks, lips or breasts of another person, or such touching through the clothing, for the purpose of arousing or gratifying sexual desire of any person." 14 V.I.C. § 1699(d); *see LeBlanc v. People*, 56 V.I. 536, 542-43 (V.I. 2012). Here, J.T. testified that Francis "was rubbing against me with his hands, with his body, [and he] pushed his hand inside of my drawers." (J.A. 41-42.) Such action clearly amounts to sexual contact as defined in section 1699. *Charles*, 60 V.I. at 834 n.6 (holding defendant's touching of minor's breasts and buttocks amounted to sexual contact). From J.T.'s testimony, the Superior Court, as the trier

the time of trial, permitted the [trier of fact] to make a reasonable inference that [J.T. and Francis] were not married at the time of the sexual contacts." *Castor*, 57 V.I. at 490.

of fact, could reasonably infer that Francis engaged in such contact for the purpose of arousing or gratifying his own sexual desire. *See Ostalaza v. People*, 58 V.I. 531, 548 (V.I. 2013) ("The jury is entitled to draw certain inferences from the evidence presented before them."); *see also State v. Olson*, 286 Mont. 364, 951 P.2d 571, 578 (1997) (determining that the defendant's rubbing of a female's breasts was for the purpose of sexual gratification); *State v. Mills*, No. M2000-01065-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 837, *14 (Tenn. Crim. App. Oct. 17, 2001) (unpublished); *State v. Bruders*, 182 Wis. 2d 512, 514 N.W.2d 879 (1994) (unpublished). The only question that remains is whether Francis used either force or coercion to accomplish this contact. J.T.'s father testified that Francis had one arm around J.T.'s neck and the other arm around J.T.'s waist, from which a trier of fact could reasonably infer that Francis was restraining J.T. — in other words using force against J.T. — in order to accomplish the sexual contact. *See Gilbert*, 52 V.I. at 362-63 & n.9 (suggesting that testimonial evidence that defendant had forced the victim against a table and used his weight to pin her down was sufficient to prove use of force). Thus, there was sufficient evidence beyond a reasonable doubt to convict Francis of unlawful sexual contact in the first degree.

### 3. Vagrancy

Section 2221(a) of title 14 provides a long list of conduct constituting vagrancy in the Virgin Islands. Francis was charged for conduct "[o]n or about July 26, 2012," that "annoyed or molested J.T., a minor child under eighteen years of age by asking J.T. to play with his (Cecil Francis') penis and having J.T. take pictures of his (Cecil Francis') penis with his cellular phone, in violation of 14 VIC Section 2221[(a)](8)." (J.A. 18.) Therefore, to justify Francis's conviction on this charge, the People must have proved that Francis "annoy[ed] or molest[ed J.T., who was a] child under the age of 18 years." 14 V.I.C. § 2221(a)(8).

The evidence clearly establishes that J.T. was under the age of 18 on July 26, 2012. (J.A. 27, 29, 103, 104.) J.T. testified that early in the morning on July 26, 2012, he was waiting at a bus stop near the hospital when Francis approached him. Francis asked J.T. to take his picture while he exposed himself. (J.A. 44-45.) J.T. complied. There was therefore sufficient evidence presented that Francis exposed himself to a minor. However, there was no evidence on the record that Francis's conduct

738

annoyed or molested J.T., and the Superior Court found that there was no evidence that J.T. was offended when Francis exposed his penis to him. (J.A. 315.) Francis argues that this lack of evidence is grounds for a reversal of his vagrancy conviction. (Appellant's Br. 14.) We agree.

■ Francis correctly points out that the Legislature did not define the word "molest," and argues that this Court is "required to utilize the narrowest definition" under the rule of lenity. (Appellant's Br. 15.) However, the rule of lenity will be used only where a criminal statute is ambiguous such that this Court is unable to discern the Legislature's intent. *Ward v. People*, 58 V.I. 277, 286 (V.I. 2013). The Legislature's failure to define a term in a statute does not, without more, make a statute ambiguous. Instead, we construe an undefined term based on its "common and approved usage." 1 V.I.C. § 42; *Defoe v. Phillip*, 56 V.I. 109, 122 (V.I. 2012). Here, the statute is quite clear: anyone who "annoys or molests any child under the age of 18" is guilty of vagrancy. 14 V.I.C. § 2221(a)(8). Two common definitions of "molest" are "to annoy, disturb, or persecute," MERRIAM-WEBSTER'S ONLINE DICTIONARY, *archived at* http://perma.cc/M3UV-G8HP, and "to bother, interfere with, or annoy." DICTIONARY.COM, *archived at* http://perma.cc/89AQ-KRBC. Neither source defines "molest" as including sexual advances as part of its primary definition. Furthermore, the word "molest" appears six times in the Virgin Islands Code, and never once in relation to sexual advances. *See, e.g.,* 12 V.I.C. § 32(f) ("No deer shall be molested while it is swimming in water."); 12 V.I.C. § 319 ("The practice of stripping, shaving, scraping, clipping or otherwise molesting egg-bearing lobsters in order to remove the eggs is prohibited.").

We are aware of courts in only two other jurisdictions that have discussed nearly identical statutes,[4] and those statutes were enacted after

---

[4] Missouri apparently also had a similar statute prohibiting a person from annoying or molesting a child that has since been repealed and replaced with a child molestation statute. MO. ANN. STAT. § 563.160 (repealed and replaced with MO. ANN. STAT. § 566.100 in 1979). The prior version of the statute listed "five kinds or categories of acts or conduct which shall constitute annoying or molesting a minor." *State v. Tandy*, 401 S.W.2d 409, 412 (Mo. 1966); *see also State v. Sullivan*, 454 S.W.2d 515, 517 (Mo. 1970). In *Tandy*, the defendant was charged with two types of prohibited behavior under the statute, each having to do with "immoral, lewd, lascivious or indecent" acts or taking "indecent or improper liberties" with the minor. 401 S.W.2d at 412. The Virgin Islands' statute has no similar qualifying language as to what type of conduct constitutes 'annoying or molesting' behavior.

adoption of section 2221(a)(8). California's similar statute states that "[e]very person who annoys or molests any child under the age of 18 shall be punished . . . ." CAL. PENAL CODE § 647.6(a)(1). In interpreting this statute, the California Supreme Court observed that the words "annoy" and "molest" "are synonymous and generally refer to conduct designed to disturb, irritate, offend, injure, or at least tend to injure, another person." *People v. Lopez*, 19 Cal. 4th 282, 79 Cal. Rptr. 2d 195, 965 P.2d 713, 717 (1998) (citing *People v. Carskaddon*, 49 Cal. 2d 423, 318 P.2d 4, 5 (1957)). However, California courts have held that "[w]hen the words annoy or molest are used in reference to offenses against children, there is a connotation of abnormal sexual motivation on the part of the offender." *People v. Pallares*, 112 Cal. App. 2d Supp. 895, 246 P.2d 173, 177 (Cal. App. Dep't Super. Ct. 1952); *see In re Gladys R.*, 1 Cal. 3d 855, 83 Cal. Rptr. 671, 464 P.2d 127, 137 (1970) (reasoning that the primary purpose of the statute is the protection of children from interference by sexual offenders). Sexual motivation may be shown by proof of conduct that "would be 'unhesitatingly' irritating or annoying to a reasonable person when directed *at a child*." *Lopez*, 965 P.2d at 721 (emphasis in original). For example, sexual motivation is proven when a man exposes his penis to a child, because his conduct is "so lewd or obscene that the normal person would unhesitatingly be irritated by it." *People v. McNair*, 130 Cal. App. 2d 696, 279 P.2d 800, 801 (1955).

In Nevada, a prior version of NEV. REV. STAT. ANN. § 207.260 provided that any "person who annoys or molests a minor is guilty of a misdemeanor."[5] *City of Las Vegas v. Eighth Judicial Dist. Ct.*, 118 Nev. 859, 59 P.3d 477, 479 (2002), *abrogated by State v. Castaneda*, 245 P.3d 550, 553 (Nev. 2010) (clarifying that "the vagueness tests are independent and alternative, not conjunctive"). The Nevada Supreme Court held that the prior version of section 207.260 was facially unconstitutional because it "(1) failed to provide the citizens of our state with fair notice of the prohibited conduct; and (2) authorized and encouraged arbitrary

[5] NEV. REV. STAT. ANN. § 207.260 has been amended multiple times since this 2000 version. The current version of the statute reads "[a] person who, without lawful authority, willfully and maliciously engages in a course of conduct with a child who is under 16 years of age and who is at least 5 years younger than the person which would cause a reasonable child of like age to feel terrorized, frightened, intimidated or harassed, and which actually causes the child to feel terrorized, frightened, intimidated or harassed, commits the crime of unlawful contact with a child." NEV. REV. STAT. ANN. § 207.260(1).

enforcement." *City of Las Vegas*, 59 P.3d at 481 (citing *City of Chicago v. Morales*, 527 U.S. 41, 56-59, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999) (plurality opinion). The Supreme Court of Nevada focused on the fact that the statute did not "specify what type of annoying behavior is prohibited, nor does it define the term 'molest' . . . and it provides no indication of whether the perpetrator must subjectively intend to annoy the minor, or if mere unintentional, bothersome conduct, in and of itself, is sufficient to subject an individual to criminal sanctions." *City of Las Vegas*, 59 P.3d at 481.

As noted above, there is nothing in section 2221(a)(8) indicating that anything more than the common definitions of "annoy" and "molest" were intended by the Legislature. However, the statute was clearly enacted to protect children, as section 2221(a)(8) can be employed only when a "child under the age of 18 years" has been annoyed. But, unlike the legislative context in California, there is no indication this statute was enacted with the intent of protecting children specifically from sexual predators, as opposed to protecting against anyone who targets children with nefarious intentions. Thus, we decline to follow California's interpretation and apply only the common definition of "molest" to section 2221(a)(8), which, in this context, means to bother, interfere with, or annoy.[6]

We find that the People failed to carry its burden of producing evidence that Francis's actions on July 26, 2012, annoyed or bothered J.T. The evidence only shows that Francis asked J.T. to take his photograph while his penis was exposed. J.T. agreed, at which point Francis asked J.T. to play with his exposed penis. J.T. declined, returned to the bus stop, and went home.[7] Because there is simply no evidence from which a trier of

---

[6] Because Francis did not raise the issue, and because we are reversing his vagrancy conviction for lack of sufficient evidence, we need not consider at this time whether 14 V.I.C. § 2221(a)(8) is unconstitutionally vague. *See Murrell v. People*, 54 V.I. 338, 347 (V.I. 2010) (stating that "it is well-established that courts possess an 'obligation . . . to avoid deciding constitutional issues needlessly' " (quoting *Christopher v. Harbury*, 536 U.S. 403, 417, 122 S. Ct. 2179, 153 L. Ed. 2d 413 (2002))).

[7] A reasonable trier of fact could infer that because J.T. rejected Francis's request, he may have been repulsed; but repulsion is not synonymous with annoyance. It is quite possible for a person to be repulsed or disgusted by another's behavior but not feel annoyed. *See People v. Dupont*, 107 A.D.2d 247, 486 N.Y.S.2d 169, 173-74 (1985) (holding that use of repulsive language does not necessarily constitute annoying conduct amounting to harassment);

fact could infer that Francis's actions annoyed J.T., we reverse Francis's conviction for vagrancy.[8]

## C. Double Jeopardy

■ Next, Francis argues that the Superior Court violated his right against double jeopardy by convicting him of two counts of aggravated rape in the second degree.[9] Although the Superior Court punished Francis only for the first aggravated rape in the second degree count, while sentencing and staying the second aggravated rape in the second degree count pursuant to 14 V.I.C. § 104,[10] Francis alleges that the Superior Court violated the Fifth Amendment's Double Jeopardy Clause when it convicted him of both counts.

■ The right to be free from double jeopardy protects a defendant from being convicted more than once under the same statute for committing one "unit of prosecution" or "criminal act," while section 104 of title 14 protects a defendant from being punished twice for the same act, even if multiple convictions are imposed because of that single act.

---

*State v. McGrantham*, 165 N.J. Super. 576, 398 A.2d 930, 933-34 (1979) (explaining statute that differentiates between conduct that is annoying and conduct that is disgusting). Without any evidence that J.T. was annoyed, we cannot affirm Francis's conviction for vagrancy on that basis.

[8] We also note that the People could have, but did not, charge Francis under 14 V.I.C. § 2221(a)(10) ("Whoever . . . willfully, openly and obscenely exposes his person in any public street, road, highway or place of public resort, or in view thereof . . . shall be deemed a vagrant and shall be fined not more than $5,000 or imprisoned not more than 90 days, or both.").

[9] "The double jeopardy prohibition found in the Fifth Amendment to the U.S. Constitution applies to the Virgin Islands by virtue of Section 3 of the Revised Organic Act." *Estick v. People*, 62 V.I. 604, 620 n.8 (V.I. 2015); 48 U.S.C. § 1561; Revised Organic Act of 1954, § 3.

[10] Section 104 states that "[a]n act or omission which is made punishable in different ways by different provisions of this Code may be punished under any of such provisions, but in no case may it be punished under more than one." *See Mercado v. People*, 60 V.I. 220, 226-27 (V.I. 2013) (prohibiting multiple punishments for a single act). Here, the Superior Court sentenced Francis to 30 years for each count of aggravated rape in the second degree, but then — at the request of the People (J.A. 333) — merged and stayed the second count citing section 104. This action was unnecessary, as explained *infra*, because each count was based on two separate acts of penetration, giving rise to two separate chargeable offenses, and thus does not fall under the protection of § 104. *See* 14 V.I.C. § 104. We also reiterate that when section 104 applies to multiple convictions, the Superior Court need not merge the counts. Instead, it should simply stay the imposition of any punishment for the related offenses. *Williams v. People*, 56 V.I. 821, 834 n.9 (V.I. 2012).

*Estick v. People*, 62 V.I. 604, 620-21 (V.I. 2015); *Rawlins v. People*, 58 V.I. 261, 275-76 (V.I. 2013); *Galloway v. People*, 57 V.I. 693, 712 (V.I. 2012). As this Court recently reiterated in *Estick*, the difference between the two protections "is between a singular offense and a singular act." *Estick*, 62 V.I. at 620 n.9 (quoting *Castillo v. People*, 59 V.I. 240, 284 n.1 (V.I. 2013) (Hodge, C.J., concurring)).

■ In *Estick*, this Court held that the defendant's right against double jeopardy was violated because the defendant was charged and convicted on two counts of reckless endangerment for firing several shots while driving along a public street: the first count was for endangering the person he was shooting at and the second count was for endangering the people located in the restaurant near where he was shooting. *Id.* at 621. The pivotal question in determining whether a double jeopardy violation has occurred is determining the "unit of prosecution." *Id.* (citing *Bell v. United States*, 349 U.S. 81, 83, 75 S. Ct. 620, 99 L. Ed. 905 (1955)). This is also defined as "the scope of a criminal act," *id.* (citing *State v. Adel*, 136 Wn.2d 629, 965 P.2d 1072, 1074 (1998)), which may be "an act or a course of conduct." *Id.* (citing *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 225-26, 73 S. Ct. 227, 97 L. Ed. 260 (1952)). In *Estick*, we held that even though the defendant fired multiple shots endangering multiple people, he engaged in only one course of conduct and thus, could be charged with only one unit of prosecution. *Id.* at 622.

■ ■ In this case, Francis contends that the acts charged in count one and count two "stemmed from a single episode of alleged sexual misconduct." (Appellant's Br. 19.) But unlike in *Estick*, where the *same* act resulted in multiple convictions, here we have *multiple* acts giving rise to multiple convictions. In count one, Francis is charged with aggravated rape in the second degree for putting his penis into J.T.'s mouth. In count two, Francis is charged with aggravated rape in the second degree for inserting his finger in J.T.'s anus. While Francis may be correct that this all occurred during "a single episode of alleged sexual misconduct," the Legislature has made it clear that these two distinct acts of penetration are to be considered separately as two units of prosecution. *See* 14 V.I.C. § 1704 ("Any sexual penetration, however slight, is sufficient to complete the crime."); *Castor v. People*, 57 V.I. 482, 492 (V.I. 2012). Even though both acts occurred in the same afternoon, each action was separate and distinct from the other. *See State v. Eisch*, 96 Wis. 2d 25, 291 N.W.2d 800, 803 (1980) (holding the acts of cunnilingus, fellatio, anal intercourse and

743

intrusion of an object into a genital opening are sufficiently different in nature to support separate convictions even when performed during a single sexual encounter). Thus, each penetration gives rise to a chargeable offense, the conviction of which does not violate a defendant's right against double jeopardy.

## D. Speedy Trial

 Francis contends that the Superior Court erred in denying his motion to dismiss the case for violating his right to a speedy trial. A criminal defendant is guaranteed a speedy trial under the Sixth Amendment of the United States Constitution, which is applicable in the Virgin Islands pursuant to the Revised Organic Act of 1954. *Barker v. Wingo*, 407 U.S. 514, 515 n.1, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972) ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . ."); *Carty*, 56 V.I. at 364 & n.11 (citing 48 U.S.C. § 1561, Revised Organic Act of 1954, § 3). The right to a speedy trial protects "the rights of the defendant which may be hampered by undue and oppressive incarceration prior to trial, anxiety and concern accompanying public accusation, and the possibility that a long delay will impair the ability of an accused to present a defense." *Carty*, 56 V.I. at 361 (citing *Klopfer v. North Carolina*, 386 U.S. 213, 221-22, 87 S. Ct. 988, 18 L. Ed. 2d 1 (1967)).

The speedy trial right provided by the Sixth Amendment is different from speedy trial rights provided by statute.[11] Thus, for example, the United States District Court of the Virgin Islands is bound by the federal Speedy Trial Act, which sets "specified time limits after arraignment or indictment within which criminal trials must be commenced" to dispose

---

[11] *See, e.g.*, NEB. REV. STAT. § 29-1207 (1) ("Every person indicted or informed against for any offense shall be brought to trial within six months, and such time shall be computed as provided in this section."); COLO. REV. STAT. ANN. § 18-1-405 (1) ("Except as otherwise provided in this section, if a defendant is not brought to trial on the issues raised by the complaint, information, or indictment within six months from the date of the entry of a plea of not guilty, . . . the pending charges shall be dismissed."); MISS. CODE. ANN. § 99-17-1 ("Unless good cause be shown, and a continuance duly granted by the court, all offenses for which indictments are presented to the court shall be tried no later than two hundred seventy (270) days after the accused has been arraigned."); MONT. CODE ANN. § 46-13-401; OHIO REV. CODE ANN. § 2945.71; *see also* ALASKA R. CRIM. P. 45 (b) ("A defendant charged with a felony, a misdemeanor, or a violation shall be tried within 120 days from the time set forth in paragraph (c) of this rule.").

of cases in a reasonable amount of time.[12] *United States v. Watts*, 47 V.I. 562, 564 (D.V.I. 2005) (quoting *United States v. Lattany*, 982 F.2d 866, 870-71 (3d Cir. 1992)); 18 U.S.C. §§ 3161-3174. "If a defendant is not brought to trial within this [statutory] time, and there are no delays excludable under 18 U.S.C. § 3161(h), the indictment or information must be dismissed." *Id. at* 565 (citing 18 U.S.C. § 3162(a)(2)).

The federal Speedy Trial Act requires each federal district court to conduct a "study of the administration of its criminal justice system and to prepare Speedy Trial plans in accordance with the Act." *Gov't of the V.I. v. Quetel*, 18 V.I. 145, 148 (V.I. Super. Ct. 1982). In June 1978, the District Court of the Virgin Islands submitted its Speedy Trial Plan to the Judicial Council for the Third Circuit recommending the maximum time limits provided by the Act; the Council approved the Plan. *Id.* at 148. Although the Act applies only to federal crimes, *Gov't of the V.I. v. King*, 25 V.I. 114, 116 (V.I. Super. Ct. 1990) (citing *Gov't of the V.I. v. Bryan*, 818 F.2d 1069 (3d Cir. 1987)), the District Court — which exercised jurisdiction over both federal and local crimes — chose to apply the Plan to all criminal defendants appearing before it, regardless of whether they were charged with local or federal crimes, in order to avoid confusion and inconsistency. *Quetel*, 18 V.I. at 148.

The Virgin Islands Legislature has not adopted a Speedy Trial Act and there is no speedy trial plan in place in the local court system.[13] *Id.* at 148-149; *King*, 25 V.I. at 117; *Gov't of the V.I. v. Zachry*, 24 V.I. 244, 248 (V.I. Super. Ct. 1989). Instead, criminal defendants appearing before

---

[12] For example, once a defendant is arrested or served with a summons, generally there is a thirty day time limit to file the information or indictment. 18 U.S.C. § 3161(b). Once the information or indictment has been filed, or the defendant appears in court, the defendant must be brought to trial within seventy days. 18 U.S.C. § 3161(c)(1). So under the federal Speedy Trial Act a defendant, without excludable delays, must be brought to trial within 100 days of arrest.

[13] The Superior Court, in an April 23, 2013 order, adopted time standards for the disposition of cases. Pursuant to these time standards, "complex felonies," which are defined as "cases where the potential penalty is more than 20 years to life imprisonment," should "be disposed within 365 days after initial filing." *In re Adoption of Time Standards*, Super. Ct. Misc. No. 39/2013, 2013 V.I. LEXIS 77, at *6 (V.I. Super. Ct. Apr. 23, 2013) (unpublished). These standards, however, do not apply to this case, since they "shall apply to all cases filed in the Superior Court on or after June 1, 2013," *id.* at *3, and the record reflects that Francis had been charged on May 6, 2013. And in any event, the time standards adopted by the Superior Court are purely aspirational, with judges only "encouraged to adapt their practices in a manner consistent" with them. *Id.*

the Superior Court have a right to a speedy trial only under the Sixth Amendment. *Carty*, 56 V.I. at 361 n.11. Rather than precise time limits established by typical statutory Speedy Trial Acts, a violation of the Sixth Amendment right to a speedy trial is determined by a four-factor balancing test: "(1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his rights; and (4) and prejudice to the defendant." *Carty*, 56 V.I. at 364 (citing *Barker*, 407 U.S. at 530); *Brown v. People*, 55 V.I. 496, 503 (V.I. 2011). On appeal, we analyze each of these factors *de novo*, but review the Superior Court's findings of fact only for clear error. *See Farrington v. People*, 55 V.I. 644, 649 (V.I. 2011) ("The standard of review for this Court's examination of the Superior Court's application of law is plenary, while the Superior Court's findings of fact are reviewed for clear error."); *Carty*, 56 V.I. at 354. The most important factor to consider is whether the defendant suffered any prejudice from the delay. *Brown*, 55 V.I. at 504. We must therefore review the procedural history of this case in detail to understand the nature and context of each continuance. *See Carty*, 56 V.I. at 361-64 (analyzing the "protracted procedural history" of the case).

Francis was arrested on May 6, 2013, and a six count information was filed against him on May 22, 2013. The Office of the Territorial Public Defender was appointed to represent Francis on May 23, 2013. The case was originally set for jury selection to occur on July 22, 2013, with the trial to commence within three weeks thereafter. On June 25, 2013, Francis informed the court that he was still waiting for "information from his employer, forensic DNA, text messages and the criminal history of the victim." (J.A. 387.) A few days later, during the July 1, 2013 pretrial conference, the People requested a continuance because the prosecuting attorney would be off-island. The Court granted the motion and the jury selection was rescheduled for November 25, 2013. (J.A. 387.) On November 6, 2013, the Office of the Territorial Public Defender moved to be removed as counsel, citing a conflict of interest with one of the People's witnesses. A week later, on November 14, 2013, Francis waived his right to a trial by jury. In response, the Superior Court set the trial to commence on December 9, 2013. But then, in a December 4, 2013 order, the Superior Court granted the Territorial Public Defender's motion to be relieved as Francis's counsel, appointed Attorney David Cattie as Francis's new counsel, and continued the bench trial to February 10, 2014, to give Attorney Cattie time to familiarize himself with the case.

On February 7, 2014, three days before trial was scheduled to commence, the People requested a continuance because two of its witnesses would not be available and because it had "recently received documents from the Defendant's counsel regarding the possibility of an alibi defense." (J.A. 387.) The trial was then continued to March 26, 2014. On March 24, 2014, the People again moved to continue, stating that it had determined that the dates in the information needed to be amended. The Superior Court continued the trial to May 6, 2014, and granted the People leave to amend the information. (J.A. 387-88.) Notably, the People filed its first amended information on May 7, 2014, one day after the case was scheduled to go to trial. Nonetheless, the trial judge assigned to this case was unexpectedly required to be out of the Territory the week of May 6, 2014, due to his brother's death, and the bench trial was continued to June 5, 2014. Trial was once again postponed because on May 29, 2014, the prosecution requested an emergency continuance due to the death of the prosecutor's brother. The trial was ultimately rescheduled to July 29, 2014.

Francis filed his motion to dismiss for a speedy trial violation on June 3, 2014, which was opposed by the People on June 6, 2014. The Superior Court, applying the four-factor balancing test for determining whether a speedy trial right has been violated, denied Francis's motion on July 25, 2014. *See Carty*, 56 V.I. at 364 (citing *Barker*, 407 U.S. at 530); (J.A. 396).

In its analysis, the Superior Court identified each delay and to which party the delay was attributed. It held that a three-month-two-week delay was necessitated by the change in defense counsel, which was to Francis's benefit. (J.A. 395.) The court also attributed another two weeks to Francis for the delay caused by his waiving his right to a trial by jury. (J.A. 395.) The court attributed a one-month-two-week delay to the People for failing to adequately prepare for trial (J.A. 395), and the initial four-month delay, initiated by the People, was held to be "only partly attributable to the People and not unduly prejudicial to [Francis]." (J.A. 395.) The Superior Court discounted the two-month-three-week delay arising from both his own and the prosecuting attorney's "family emergencies." (J.A. 395.) Ultimately, the Superior Court held that much of the delay was "attributable to or on the behalf of both parties" and that there was no speedy trial violation because Francis "failed to prove how the length of the delay has prejudiced him." (J.A. 396.)

■ Since we engage in *de novo* review of the Superior Court's application of facts to the law, we now conduct our own *Barker* analysis. *See Carty*, 56 V.I. at 364. Initially, we must decide whether the delay is sufficiently lengthy to trigger a speedy trial evaluation. A longer delay is more "presumptively prejudicial" to the rights of a defendant and weighs in favor of examining the remaining three *Barker* factors. *Doggett v. United States*, 505 U.S. 647, 651-52, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992). In *Carty*, we held that the 25-month delay between Carty's arrest and trial "constituted an unusual and interminable length of delay" that necessitated further scrutiny. 56 V.I. at 365. Here, the delay between Francis's arrest and the bench trial was almost 15 months. While this 15-month delay falls far short of the 25 months in *Carty*, we have also recognized that a delay over 12 months is "presumed to be sufficiently prejudicial to require evaluation of the three remaining factors." *Id.* (citations omitted); *Brown*, 55 V.I. at 503 (holding that the Superior Court correctly proceeded to examine the remaining factors where delay was greater than one year). Therefore, a delay of 15 months weighs in favor of Francis, and is sufficient to require evaluation of the three remaining *Barker* factors. *See also United States v. Battis*, 589 F.3d 673, 678 (3d Cir. 2009) (holding 14-month delay is sufficient to trigger evaluation of the remaining *Barker* factors); *United States v. Hatchett*, 987 F. Supp. 2d 529, 538 (E.D. Pa. 2013) (holding 13-month delay is enough) (collecting cases).

■ Once we have determined a delay is sufficiently lengthy to trigger a speedy-trial analysis, we determine which party is responsible for the delay and why. Delays attributed to the People weigh in favor of Francis's speedy trial claim, while delays attributed to Francis do not. *See Vermont v. Brillon*, 556 U.S. 81, 82, 129 S. Ct. 1283, 173 L. Ed. 2d 231 (2009) (analyzing "whether the government or the criminal defendant is more to blame for th[e] delay") (quoting *Doggett*, 505 U.S. at 651). Moreover, the reason for the delay impacts the weight given a particular delay. *Doggett*, 505 U.S. at 657 ("*Barker* made it clear that 'different weights [are to be] assigned to different reasons' for delay.") (quoting *Barker*, 407 U.S. at 531).

Here there were multiple delays, caused by both parties and the Superior Court itself. The People's first requested continuance was due to the prosecuting attorney being off-island during the time of the scheduled trial. This delay is mitigated by the fact that Francis informed the Superior

Court that he was still waiting on "information from his employer, forensic DNA, text messages, and the criminal history of the victim" for his defense. (J.A. 387.) Thus, this delay should not be attributed to either party, as neither was prepared to move forward with trial.

The second delay was caused when the Territorial Public Defender requested to be released as Francis's counsel due to a conflict of interest with one of the People's witnesses.[14] This resulted in the Superior Court appointing new counsel to represent Francis and *sua sponte* continuing the bench trial until February 10, 2014, in an order dated December 4, 2013, and entered by the clerk of the court on December 24, 2013. The Superior Court reasoned that this continuance was necessary to protect Francis's due process right to a fair trial by allowing his newly appointed counsel sufficient time to prepare his defense. (J.A. 391.)

█ We agree that the Superior Court acted within its discretion in *sua sponte* continuing the trial date to allow Francis's newly appointed counsel sufficient time to prepare for trial. *See, e.g., United States v. Harris*, 566 F.3d 422, 431 (5th Cir. 2009) (delay due to a continuance granted *sua sponte* after the court granted a motion to appoint new counsel was considered excludable from the speedy trial calculation); *Manix v. State*, 895 So. 2d 167, 175 (Miss. 2005) ("A delay caused by the withdrawal of the defendant's attorney which entails allowing the new attorney a reasonable time to become familiar with the case and prepare for trial cannot be weighed against the State."); *see also* 18 U.S.C. § 3161(h)(7)(A) & (7)(B)(iv) (under the federal Speedy Trial Act, delay is not counted against the government for "the reasonable time necessary for [counsel's] effective preparation, taking into account the exercise of due diligence" when judge *sua sponte* grants a continuance to serve the "ends of justice"); *State v. Tucker*, 132 N.H. 31, 561 A.2d 1075, 1077 (1989) (holding appointment and preparation of new counsel due to conflict of interest was neither party's fault). However, we note that it would have been better practice for the court to consult with Francis and his newly

---

[14] We are concerned about the ability of the Territorial Public Defender to withdraw as counsel for a defendant merely because of an alleged conflict of interest with one of the People's witnesses. Even where a conflict of interest exists, an attorney may continue with the representation after obtaining written consent from the affected clients. *See* V.I.S.Ct.R. 211.1.7 and 211.1.10. There is no indication on this record as to whether Francis was presented with the possibility of remaining with his appointed Territorial Public Defender, should he have wished to do so, in order to retain the December 9, 2013 trial date.

appointed attorney before continuing the case *sua sponte*, because, although unlikely, it is possible that Francis would have been prepared to proceed with the scheduled December 9, 2013 trial date. *See State v. Wagner*, 88 Ohio App. 3d 398, 623 N.E.2d 1338, 1342 (1993) (holding continuance granted *sua sponte* should be counted against the government, even if it was for the defendant's benefit, where defendant did not request continuance and court did not justify the decision in writing). But given that trial was supposed to have commenced within days of the new appointment, we find that the court's *sua sponte* continuance was reasonable and thus do not count it against the People.

▓▓ In February 2014, the People were unable to go forward with the trial because one of its witnesses — the matter's case-agent — was going to be unavailable, because he was scheduled to travel off-island to pick-up a prisoner. The Superior Court found that there was "no evidence that the People sought to delay the trial 'for the purpose of obtaining an unfair advantage in this case or in an effort to impede, obstruct, or hamper the defense in preparing or presenting its case' " and thus it found that while the time extension was reasonable, it must be counted against the People. (J.A. 392.). *See Carty*, 56 V.I. at 366; *Barker*, 407 U.S. at 531 (indicating that "a valid reason" for a delay might include a missing witness). Although the Superior Court correctly weighed this delay against the People, we are concerned by the People's inability to have one of its witnesses — another government employee — available for trial on a date that the court had scheduled with two-months advanced notice. While certain circumstances may justify the delay of a trial due to the unavailability of a witness, *see United States v. Hale*, 685 F.3d 522, 536 (5th Cir. 2012) (holding the court's decision not to count the delay caused by a "critical fact witness" who had a family emergency and was unavailable to attend trial was not clearly erroneous), the trial court must be satisfied that the reason a witness is unavailable justifies a continuance. *See, e.g., Baustert v. Superior Court*, 129 Cal. App. 4th 1269, 29 Cal. Rptr. 3d 208, 213 (2005) ("[T]he fact that a witness will be on vacation on the date set for trial does not by itself constitute good cause for a continuance."); *Cain v. State*, 277 Ga. 309, 588 S.E.2d 707, 708 (2003) (upholding denial of a continuance where witness was never subpoenaed and the witness's whereabouts unknown). In this case, there is no indication as to why another officer could not have completed the prisoner pick-up or if the pick-up dates could have been rescheduled to

750

accommodate the trial calendar. Therefore, we agree with the trial court that this delay must be counted against the People.

As further reason for its February 7, 2014 motion to continue, the People indicated that it had received documents from Francis's attorney which indicated a possible alibi defense. Indeed, it appears that Francis did have an alibi because on March 24, 2014, just two days before the March 26, 2014 trial date, the People, after further interviewing J.T., requested another continuance to amend the dates in the information. (J.A. 391.) This delay is also attributable to the People, as it was to the People's benefit to have the extra time to amend the information.

 The first amended information was not filed until May 7, 2014, one day after the trial was scheduled to have commenced. The Superior Court judge however, had a death in his family and was unavailable to hear the case on the scheduled date. Similarly, the People's final continuance was due to a death in the prosecuting attorney's family. In his appellate brief, Francis recognizes that some courts do not weigh delays caused by family emergencies. (Appellant's Br. 24.) *See State v. Ochoa,* 2014- NMCA 065, 327 P.3d 1102, 1106 (2014), *cert. granted,* 328 P.3d 1188 (N.M. 2014) (holding death in the judge's family which caused three-month delay was not weighed against any party); *State v. Willis,* No. C3-97-1331, 1998 Minn. App. LEXIS 306, *6 (Minn. Ct. App. Mar. 17, 1998) (unpublished) (holding prosecutor's family emergency constituted good cause for delay). However, under *Barker,* even "more neutral reason[s for a delay,] such as negligence or overcrowded courts[,] should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." 407 U.S. at 531; *Brown,* 55 V.I. at 504 n.7 (holding "delays caused by the Superior Court are attributed to the government") (citing *Burkett v. Fulcomer,* 951 F.2d 1431, 1440 (3d Cir. 1991))). Thus, we disagree with the Superior Court and hold that the delays caused by both the judge's and prosecution's family emergencies are attributable to the People, although the weight of these delays is treated as minor. Therefore, the delay in Francis's trial is attributed at varying times to both parties, with the majority of the delays being attributed to the People. However, the delays should not be given much weight, given the justifications for each delay.

■ Next, we look to the third speedy trial factor: whether the defendant asserted his rights, evidencing a deprivation of his constitutional rights. *Carty*, 56 V.I. at 366.

> A defendant shows that he has asserted his right to a trial (1) when he is represented by counsel and he can identify a motion or evidence of direct instructions to his counsel to assert that right at a time when a formal assertion of his rights would render some chance of success; or (2) if defendant is proceeding *pro se*, he is not required to make a procedurally perfect assertion of his right to a speedy trial; instead, he must make a reasonable assertion of his right to a speedy trial in a manner that would place authorities on notice of his claim.

*Id.* at 366 (citing *Battis*, 589 F. 3d at 681). Francis first asserted his right to a speedy trial at his arraignment on May 23, 2013. (J.A. 393.) Francis also objected to at least one of the People's requests to continue, but he was not given the opportunity to object to multiple others because the Superior Court granted the motions on the same day they were filed.[15] Francis expressly reasserted his right to a speedy trial on June 3, 2014, in his motion to dismiss, which was filed one day after the Superior Court granted the People's final motion to continue. Francis went to trial almost two months later, on July 29, 2014.

The Superior Court determined that Francis's June 3, 2014 motion was not made at a time when a formal assertion "would render some chance of success" and was filed only for tactical reasons since it was filed so close to the new trial date. (J.A. 394.) We disagree. Even though the Superior Court had already rescheduled Francis's trial, there is a strong possibility that the court may have been amenable to granting further motions to continue, as evidenced by its granting multiple continuances for various reasons earlier in the case — often on the same day the motion was filed. (J.A. 12-13.) Furthermore, by the time Francis moved the court

---

[15] In its March 26, 2014 order granting the People's motion to amend the information, the Superior Court determined that granting a continuance was "in the interest of justice," apparently over Francis's objections, even though there is no indication in the docket that a written objection was submitted or that a hearing was held. Francis was not afforded the opportunity to object to the People's February 7, 2014 motion to continue based on the unavailability of one of its witnesses, or the People's May 29, 2014 emergency motion to continue due to the death in the prosecutor's family, because the Superior Court granted both motions on the same day they were filed.

to dismiss his case, more than 12 months had already passed. Thus, Francis's motion to dismiss for a speedy trial violation was made at an appropriate time, as it was well within the realm of possibility that the Superior Court could have granted the motion.

 Although not dispositive of a successful Sixth Amendment speedy-trial claim, "the failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *United States v. Thomas*, 55 F.3d 144, 150 (4th Cir. 1995) (quoting *Barker*, 407 U.S. at 532); *see Estrada v. State*, 611 P.2d 850, 853 (Wyo. 1980). "[T]he accused's various responses to the delays must be evaluated based on the surrounding circumstances — such as the timeliness, persistence, and sincerity of the objections, the reasons for the acquiescence, whether the accused was represented by counsel, the accused's pretrial conduct (as that conduct bears on the speedy trial right), and so forth." *State v. Ariegwe*, 2007 MT 204, 338 Mont. 442, 167 P.3d 815, 841 (2007) (citing *United States v. Loud Hawk*, 474 U.S. 302, 314, 106 S. Ct. 648, 88 L. Ed. 2d 640 (1986)). The circumstances surrounding Francis's objection do not strongly support a conclusion that his right to a speedy trial was violated. While there is some evidence that Francis may have objected to at least one continuance, he was not persistent in his request to go to trial until a year after he was arrested. A defendant's assertion of his right to a speedy trial "is closely related to the other factors" and the "more serious the deprivation, the more likely a defendant is to complain." *Barker*, 407 U.S. at 531. Therefore, because Francis asserted his right to a speedy trial at his arraignment, and because he objected to at least one continuance, we conclude that this factor weighs slightly in favor of Francis.

 Finally, we consider whether the multiple delays prejudiced Francis in any way. We must assess prejudice to a defendant caused by a speedy trial violation by considering the three interests a right to a speedy trial is designed to protect: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Carty*, 56 V.I. at 367 (quoting *Barker*, 407 U.S. at 532). Francis argues his lengthy pretrial incarceration caused him prejudice in the form of financial loss and curtailment of his associations. *See United States v. Marion*, 404 U.S. 307, 320, 92 S. Ct. 455, 30 L. Ed. 2d 468 (1971) ("Arrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his

employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends."); *State v. Palacio*, 2009- NMCA 074, 146 N.M. 594, 212 P.3d 1148, 1155 (2009) (considering multiple factors when deciding speedy trial violations, including "employment loss, financial and economic loss, and whether the accused's associations were curtailed").

Francis undoubtedly suffered some prejudice due to his pretrial incarceration. He was clearly unable to work, resulting in financial loss, and he was limited in his associations. Francis also argues that his defense was prejudiced because with the passage of time, people's memories fade and details and pertinent facts will become less clear. *Brooks v. Gov't of the V.I.*, 58 V.I. 417, 429 (V.I. 2013) (recognizing that parties may be "prejudiced by an extended passage of time between [an administrative agency decision] and the Superior Court proceedings, with all the correlating risks of lost evidence and faded memories"). Francis specifically references the first amended information as proof that memories change. We are not convinced that the first amended information is the result of changing memories. In fact, the record makes it quite clear that the first amended information was the result of the prosecution investigating the dates of the alleged acts more thoroughly after being presented with Francis's alibi statement. Furthermore, the two main witnesses in this case were J.T. and his father, both of whom were able to testify clearly as to the events in question.

■■■ We recognize that although the defendant bears the burden of proving prejudice, *Carty*, 56 V.I. at 367 (citing *Hakeem v. Beyer*, 990 F.2d 750, 760 (3d Cir. 1993)), "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Doggett*, 505 U.S. at 655. This presumptive prejudice, however, is insufficient to prove a Sixth Amendment speedy trial violation. *Id.* (citing *Loud Hawk*, 474 U.S. at 315). While we agree that Francis may have suffered some prejudice due to his pre-trial incarceration, he is unable to point to a particular prejudice impacting his ability to receive a fair trial, so we do not regard his near-15-month incarceration as resulting in substantial prejudice. *See United States v. Santiago-Becerril*, 130 F.3d 11, 23 (1st Cir. 1997) (holding general prejudice, with no indication of actual prejudice, from a 15-month trial delay was insufficient to sustain constitutional speedy trial claim); *State v. Garza*, 2009 - NMSC 038, 146 N.M. 499, 212 P.3d 387, 399 (2009)

(holding that in case with a ten-month trial delay, "some [non-particularized] prejudice is not the type of prejudice against which the speedy trial right protects") (internal quotations omitted); *Taylor v. State*, 162 So. 3d 780, 787 (Miss. 2015) (holding that "unquestionable lack of actual prejudice outweighs the other factors" in 18-month trial delay).

 ██ Balancing all four *Barker* factors, as we are compelled to do, *Ariegwe*, 167 P.3d at 846-47, we conclude that Francis's trial was not delayed to the extent that his Sixth Amendment right to a speedy trial was violated. "The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice." *Beavers v. Haubert*, 198 U.S. 77, 87, 25 S. Ct. 573, 49 L. Ed. 950 (1905). Although it took almost 15 months before Francis went to trial, the reasons behind most of the delays were reasonable and any prejudice Francis suffered due to the length of his pre-trial incarceration is minimal. *See Brown v. People*, 55 V.I. 496, 504 (V.I. 2011), *overruled on other grounds, Williams v. People*, 56 V.I. 821, 834 (V.I. 2012) (holding no speedy trial violation after weighing *Barker* factors); *Ariegwe*, 167 P.3d at 841; *Garza*, 212 P.3d at 399. He requested a speedy trial at his arraignment but was not persistent about enforcing this right as the case progressed, until after 12 months had already passed. The case went to trial a short time later. Thus, when looking at all the factors, we agree that Francis's Sixth Amendment right to a speedy trial was not violated.

### E. Motion for a New Trial

Finally, Francis argues that the Superior Court erred in denying his motion for a new trial because there was "absolutely no physical evidence establishing that Mr. Francis committed any of the alleged crimes." (Appellant's Br. 18.) "Superior Court Rule 135 allows the Superior Court to 'grant a new trial in 'the interest of justice.' " *Percival*, 62 V.I. at 490; *Joseph v. People*, 60 V.I. 338, 345 (V.I. 2013). We review the denial of a motion for a new trial for an abuse of discretion. *See Thomas*, 60 V.I. at 693.

 We have never held that physical evidence is necessary to convict a criminal defendant. *See Francis v. People*, 57 V.I. 201, 211 (V.I. 2012) ("[T]he absence of physical evidence to corroborate S.A.J.'s testimony does not in and of itself, render S.A.J.'s testimony insufficient to sustain a conviction for aggravated rape in the first degree."). In fact,

755

this Court has repeatedly held that the testimony of one witness is sufficient to sustain a conviction. *Charles*, 60 V.I. at 832 n.5 ("The testimony from X.P. alone is enough to prove all the elements required."); *Rawlins*, 61 V.I. at 604 ("[T]he testimony of one eyewitness is sufficient for the purpose of identification of the perpetrator of the crime." (quoting *Connor v. People*, 59 V.I. 286, 291 (V.I. 2013)); *Francis*, 57 V.I. at 211. In denying Francis's motion for a new trial, the Superior Court stated it had determined that J.T. was a credible witness and that it found Francis's testimony to be "largely untrustworthy." (J.A. 304, 306); *see Fahie v. People*, 62 V.I. 625, 632 (V.I. 2015) (explaining that "the court may weigh the evidence and the credibility of witnesses, and if the court determines that there has been a miscarriage of justice, the court may order a new trial" (citing *Morton v. People*, 57 V.I. 72, 77 (V.I. 2012)). And, as determined above, there was sufficient evidence to sustain each of Francis's convictions, with the exception of vagrancy. Francis does not identify any error that would amount to a miscarriage of justice so we affirm the Superior Court's denial of Francis's motion for a new trial. *Fontaine v. People*, 56 V.I. 571, 584 (V.I. 2012) (holding a lack of physical evidence does not render guilty verdict insufficient).

## III. CONCLUSION

For the foregoing reasons, this Court affirms the Superior Court's conviction of Francis for both counts of aggravated rape in the second degree and one count of aggravated sexual contact in the first degree, but reverses Francis's conviction for vagrancy due to a lack of sufficient evidence. We also reject Francis's claims that the People violated his rights against double jeopardy and to a speedy trial. Finally, we find no merit to Francis's contention that the Superior Court abused its discretion in refusing to grant his motion for a new trial.